COUNTY OF CHENANGO, Appellant, v COUNTY OF BROOME et al.,
Respondents.

Third Department, June 18, 1992

APPEARANCES OF COUNSEL

*Hancock & Estabrook (Renee L. James* and *David E. Peebles* of counsel), for appellant.

*Levene, Gouldin & Thompson (Michael R. Wright* of counsel), for County of Broome, respondent.

### OPINION OF THE COURT

HARVEY, J.

This action concerns a disputed boundary line between plaintiff and defendant County of Broome (hereinafter defendant). An understanding of this dispute requires a brief explanation of these counties' histories. Plaintiff was created by enactment of Laws of 1798 (ch 31) from portions of Herkimer and Tioga Counties. Subsequently, by Laws of 1801 (ch 123), the Legislature divided the State into 30 counties. In 1806, Madison County was created from a portion of plaintiff (L 1806, ch 70) and defendant was created from a part of Tioga County (L 1806, ch 89). In 1813, the Legislature divided the State into 47 counties. Finally, in 1840, the Legislature enacted legislation making a part of the Town of Greene in plaintiff a part of the Town of Barker in defendant (L 1840, ch 180).

Disputes between plaintiff and defendant as to the actual course of the boundary line between the two eventually resulted in the commencement of this action in 1982. Plaintiff seeks a declaratory judgment that the boundary line between the parties is a straight line along the disputed area and that, if necessary, a survey be ordered with the parties sharing the costs thereof. Supreme Court ordered plaintiff to serve various other parties that might be affected by the action, including property owners in the disputed area and the towns and school districts that would be impacted by any decision, and

an amended summons and complaint were served. The State was also served. Defendant answered and alleged various affirmative defenses. Plaintiff subsequently moved for summary judgment seeking the dismissal of defendant's defenses and grant of affirmative relief. Supreme Court denied this motion and plaintiff now appeals.

■ Initially, plaintiff argues that Supreme Court erred in finding that questions of fact existed pertaining to the intent of the Legislature in its description of the disputed boundary line. According to plaintiff, the language used by the Legislature in the various descriptions of the boundary line in dispute clearly indicates, as a matter of law, that the boundary line is to run in a straight line in the area in question. We must agree with these arguments. In its decision, Supreme Court essentially concluded that summary judgment could not be granted because slight differences in the language used by the Legislature in the various enactments to describe the disputed boundary line created an ambiguity and the evidence submitted on the motion was insufficient to permit the court to properly discern the legislative intent. Supreme Court erred in so holding, however, because the construction and interpretation of statutory enactments and written laws are for the courts to determine as questions of law and are not for a jury tᴏ determine *(see, Goncalves v Regent Intl. Hotels,* 58 NY2d 206, 218).

Supreme Court's concern over the disputed boundary lines stems from the various descriptions of the same contained in the pertinent legislative enactments. When plaintiff was first created, the enactment stated that the boundary at issue in the present action was to run "beginning at the south east corner of the county of Onondaga thence a direct course to the confluence of the Tioughnioga & Chenango rivers" (L 1798, ch 31). Thereafter, in the 1801 legislative enactment dividing the State into 30 counties, plaintiff's boundary was described as running on "a line drawn from the south east corner of the said tract on a direct course to the confluence of the Tioughnioga and Chenango rivers and to the east bank of [said] river" (L 1801, ch 123). Finally, when the State was divided into 47 counties in 1813, the legislation described plaintiff's boundary as running along "a line drawn from the southeast corner thereof to the confluence of the Tioughnioga and Chenango rivers, and to the east bank of the last mentioned river" (L 1813, ch 39). Although Supreme Court found that the slight variation in how the phrase "a line drawn" in the last two

boundary descriptions quoted served to cloud the intent of the Legislature in describing the disputed boundary line, we cannot agree in the finding of ambiguity.

In the absence of any surveys by the State of the pertinent county lines or any further elucidating legislative history, the legislative intent in this matter can be resolved by general principles of statutory construction. The use of the phrase "direct course" in the first two enactments (L 1798, ch 31; L 1801, ch 123) indicates that the Legislature intended to have the boundary run in a straight line. Notably, "course" has been defined as "the bearing of a line; also the bearing and length of a line" (Definitions of Surveying & Associated Terms 45 [1972]). The enactments stating that the boundary should be on a "line" drawn between two points (L 1801, ch 123; L 1813, ch 39) give no indication that this additional language was meant to change the original boundary line. Significantly, in the absence of further description, a boundary line in an instrument described as running between two monuments is presumed to be a straight line (1 Warren's Weed, New York Real Property, Boundaries, § 1.04 [2]). While it is true that the use of different words in subsequent legislative enactments or even the same enactment may be a basis for finding that a different meaning was intended, the intent of the Legislature is paramount and the use of different language does not necessarily require that different meanings be found (McKinney's Cons Laws of NY, Book 1, Statutes § 231). Unlike a situation involving a deed between private parties, this case involves a statutory enactment of the Legislature, which has absolute authority over boundary lines *(see, Adriaansen v Board of Educ.,* 222 App Div 320, 323-324, *affd* 248 NY 542). Inasmuch as there is nothing in the record that would indicate that the Legislature meant anything other than a straight line in creating the boundary line, summary judgment in plaintiff's favor on this point should have been granted.

■ Plaintiff should, however, only be granted partial summary judgment. While the description of a boundary line is a question of law, the location of the boundary presents a question of fact *(People v Hillman,* 246 NY 467, 473). Here, we note that an unresolved question still remains as to the location of the original confluence of the two rivers that form one of the endpoints of the boundary line in question. Apparently, the channels of the rivers have changed from the original point of their confluence over time; therefore, this

question cannot be determined without more proof. While this issue makes it necessary to remit the matter to Supreme Court, we nevertheless agree with plaintiff that defendant's affirmative defenses should be dismissed. The doctrine of acquiescence has no application with respect to the legislative enactment of boundaries (see, La Porto v Village of Philmont, 39 NY2d 7, 13). Moreover, because defendant's defenses based upon "estoppel" and laches are premised upon the same rationale as its acquiescence defense, they should also be dismissed (see, supra, at 12; New York State Water Resources Commn. v Liberman, 37 AD2d 484, 489, appeal dismissed 30 NY2d 516).

MIKOLL, J. P., LEVINE, CREW III and CASEY, JJ., concur.

Ordered that the order is modified, on the law, without costs, by reversing so much thereof as denied the motion seeking a declaration that the disputed boundary is a straight line and dismissing the defenses asserted in defendant County of Broome's answer; motion granted to that extent, said affirmative defenses are dismissed, and it is declared that the disputed boundary line runs in a straight line from the southeast corner of Cortland County (formerly Onondaga County) to the confluence of the Tioughnioga and Chenango Rivers, and to the east bank of the Chenango River, as it existed in 1813; matter remitted to the Supreme Court for further proceedings not inconsistent with this court's decision; and, as so modified, affirmed.